871 P.2d 826

**SEUBERT EXCAVATORS, INC., an Idaho corporation, Plaintiff–Appellant,**

v.

**EUCON CORPORATION, an Idaho corporation, D/B/A Steelman–Duff and United States Fidelity & Guaranty Company, Defendants–Respondents.**

**EUCON CORPORATION, an Idaho corporation, Third–Party Plaintiff,**

v.

**EMPLOYERS INSURANCE OF WAUSAU, Third–Party Defendant–Appellant.**

No. 20615.

Supreme Court of Idaho, North Idaho, October 1993 Term.

March 18, 1994.

410

Clark & Feeney, Lewiston, for appellants. P. Tom Clark argued.

Clements, Brown & McNichols, Lewiston, for respondents. Michael E. McNichols argued.

BISTLINE, Justice.

## BACKGROUND AND PRIOR PROCEEDINGS

In January 1983, the Washington State Department of Transportation ("WSDOT") awarded a prime contract to Seubert Excavators, Inc. ("Seubert") for reconstruction of 7.2 miles of highway in south-central Washington. The contract called for (a) grading, including excavation and installation of culverts, (b) crushing rock and placing it on the road, and (c) paving the road. The prime contract, which incorporated various WSDOT standard specifications, specified that work would begin on April 1, 1983 and be substantially completed by September 21, 1983, and provided for liquidated damages and actual engineering costs in the event of delay.

Seubert subcontracted the grading and excavation work to Eucon Corporation, d/b/a Steelman–Duff ("Steelman–Duff"), retained the rock-crushing and rock placement work for itself, and subcontracted the paving work to Transtate Paving ("Transtate"). The subcontract with Steelman–Duff directed Steelman–Duff to "continue diligently in the performance" of the project and "to fully complete all of said work to the satisfaction of the CONTRACTOR and PRINCIPAL by September 30, 1983."

The record discloses that this project required the general contractor and subcontractors to first excavate, grade, gravel and pave two detours ("D1" and "D2"). Once traffic was directed onto the detours, the work plan called for excavating the roadway, crushing rock to produce the necessary gravel, and paving the roadway. The contract required the state of Washington to approve the various steps of the project as they were completed. Coordination of the various contractors, equipment, and the state engineers during these phases was therefore critical for the timely completion of the entire reconstruction project.

The parties began construction of D1 and D2 in February of 1983, well ahead of their projected schedule. The record implies that the completion of D2 was somewhat delayed by the state approval process, by problems with the soil, and by the fact that Seubert crushed extra rock at the D2 site. Seubert later argued that the delay in completing D2 was caused by Steelman–Duff and that this delay contributed to the delay of the entire project, but the district court found the construction of D2 was approximately on schedule.

To speed up the pace of the project, Steelman–Duff excavated and graded the shoulders of the existing highway while D2 was still under construction. At a meeting between the parties on March 24, 1983, Seubert apparently promised that a large rock crusher would soon be on-site, although the parties dispute the precise date that was promised. This large crusher was more efficient than the smaller crusher that at that time was in use on D2. Since the Washington State

specifications for the project allowed only two miles of ungravelled highway at a time, Steelman–Duff's plan to excavate the rest of the highway was contingent upon the ready supply of gravel that would be provided by the large rock crusher. An employee for Steelman–Duff testified that Seubert promised to consider utilizing a smaller crusher to crush and place rock on the roadway if the large crusher was delayed. Because of this statement, ideal moisture conditions on the road, and Steelman–Duff's desire to remain on schedule as much as possible, Steelman–Duff began to remove the asphalt on the existing roadway on March 28. The large crusher did not arrive, and for financial reasons, Seubert did not use the smaller crusher to produce the requisite gravel. Displeased by the lack of gravel available to cover the excavated roadway, the state of Washington promptly stopped Steelman–Duff's progress. Lacking any more work, Steelman–Duff left the site from April 8 to May 4.

Seubert's large crusher did not arrive on-site until April 26 and did not commence crushing base rock to place on the roadway until May 4. The record discloses that base rock was scheduled for placement on the excavated roadway beginning on April 11. Seubert argues that this delay did not slow the overall pace of the project. However, Steelman–Duff testified that crushed rock could have been placed on two miles of the excavated roadway as early as April 5.

Upon the arrival of the large rock crusher, Steelman–Duff and Seubert continued to excavate, grade, crush rock, and place gravel upon the roadway. Further delays occurred during this time, the responsibility for which is hotly disputed by the parties. By June 22, Steelman–Duff had excavated all but a small section in the middle of the roadway, where Seubert was operating its rock-crushing equipment. Concluding that it could not complete this section with Seubert there, Steelman–Duff temporarily moved its personnel and equipment to another project; Steelman–Duff's motivation for doing so is one of the major disputes in this case. Seubert finished crushing and left this section on July 19, 1983. At some point, the parties became aware that extra rock in the roadway needed to be excavated. After some haggling over which contractor would pay for drilling and blasting this extra rock, Steelman–Duff returned to the site and excavated the excess rock, finishing on September 2. Steelman–Duff completed its work on the project on September 12, 1984, well ahead of its September 30, 1984, deadline. On September 19, Transtate began paving the road, despite requests from WSDOT and Seubert to commence paving earlier. The entire project was not substantially completed until September 30, seven working days after the project deadline.

WSDOT withheld $10,622.93 from its final payment to Seubert, as liquidated damages and engineering costs for failure to substantially complete the project on time. Seubert in turn withheld this amount from Steelman–Duff. Steelman–Duff filed a notice of claim with WSDOT to recover the $10,622.93 and additional damages. In response, Seubert filed suit against Steelman–Duff and Steelman–Duff's surety, United States Fidelity & Guaranty ("USF & G"), seeking reimbursement for (1) crushing and stockpiling 3,500 tons of surfacing material; (2) an alleged overpayment of $977.60 to Steelman–Duff; and (3) other costs incurred by Seubert, such as road maintenance, due to Steelman–Duff's alleged delays. Steelman–Duff counterclaimed against Seubert and filed a third party claim against Employer's Insurance of Wausau, Seubert's surety ("Wausau"), to recover (1) the $10,622.93; (2) the damages allegedly incurred for maintenance of the excavated highway when the large crusher was delayed; (3) the costs of mobilization and remobilization of its equipment during other delays in the project schedule; and (4) attorney fees. Seubert's attorney appeared on behalf of Wausau and stipulated to adding Wausau as a party. Steelman–Duff then apparently overlooked introducing into evidence its notice of completion of the project or the Wausau bond.

After a bench trial, the district court ruled that Seubert was entitled to $1,032.00 for road maintenance. The court held that Seubert had wrongfully withheld $10,622.93 from Steelman–Duff, and thus awarded the difference between the parties' offsetting awards,

or $9,590.93, to Steelman–Duff, including prejudgment interest. The court ruled that Seubert, WSDOT, and Transtate had contributed to the delay, but that Seubert was not liable to Steelman–Duff for any other damages that Seubert allegedly caused. The court's original memorandum of decision did not mention Wausau.

When Steelman–Duff later sought attorney fees from Wausau under I.C. § 41–1839 and R.C.W. 39.08.030, Wausau protested because the bond and notice of completion of the project to Wausau were not in evidence, Washington law had not been pled, and the district court had made no findings against Wausau in its memorandum decision. The district court refused to apply Washington law, but, over Seubert's objection, granted Steelman–Duff's motion to reopen the evidence to admit Wausau's bond and the notice of completion. The district court then amended its findings of fact and conclusions of law to rule that Steelman–Duff was a third party beneficiary of the bond and that Wausau was liable under I.C. § 41–1839 for a portion of Steelman–Duff's attorney fees.

Upon Seubert's appeal, the Court of Appeals affirmed most of the findings and conclusions of the district court, but held that Seubert was entitled to recover the $977.60 overpayment to Steelman–Duff. As the prevailing party, Steelman–Duff was awarded attorney fees on appeal.

Pursuant to I.A.R. 118, Seubert petitions this Court to review the following issues: (1) whether Steelman–Duff was contractually responsible for the project delays; (2) whether it was proper to award prejudgment interest to Steelman–Duff; and (3) whether Steelman–Duff was a third party beneficiary of the surety bond.

In addition, this Court will review the other issues which were raised by Seubert before the case was assigned to the Court of Appeals. *See Sato v. Schossberger,* 117 Idaho 771, 792 P.2d 336 (1990). These issues include: (1) whether the district court was correct in denying Seubert the stockpiling costs which Seubert incurred when Steelman–Duff left the work site; and (2) whether the district court was correct in failing to award Seubert the alleged overpayment made to Steelman–Duff.

Although we value the opinion of the Court of Appeals for the insight it gives us in addressing the issues that were presented on appeal, our review of this case focuses on the correctness of the district court decision. *Sato v. Schossberger,* 117 Idaho at 775, 792 P.2d at 340.

## ANALYSIS

### I. Did Seubert wrongfully withhold liquidated damages and engineering costs from Steelman–Duff?

The district court found that both Seubert and Steelman–Duff were responsible for some of the delays that occurred during the highway reconstruction project. The district court nevertheless found that Steelman–Duff performed its part of the project with "due diligence."

Seubert challenges this finding of due diligence and argues that the district court failed to evaluate Steelman–Duff's compliance with other provisions in the subcontract. Seubert argues that before Steelman–Duff left the work site on June 23, the subcontractor was aware or should have been aware of the excess rock that needed to be removed, that Steelman–Duff did not remove such rock because Steelman–Duff's president "was not paying attention to the job," and that this failure to remove the excess rock until early August significantly delayed the completion of the project. Seubert therefore concludes that Steelman–Duff breached the WSDOT standard specifications which (1) prohibited voluntary shutdowns, slowing of operations, or unauthorized suspension of work; (2) required Steelman–Duff to apply sufficient labor and equipment to carry out the progress schedule; and (3) provided that time was of the essence.

This Court will uphold the findings and conclusions of the district court regarding a party's compliance with a contract when such findings are supported by substantial and competent, albeit conflicting, evidence. *See, e.g., Foley v. Munio,* 105 Idaho 309, 311, 669 P.2d 198, 200 (1983). Hyrum Cox, Steelman–Duff's president, testified

that he had no reason to foresee the excavation of excess rock, since this was a "balanced" project, which meant that the contractors would use all available rock and that no additional excavation would be necessary. Cox additionally noted that earlier in the project the contractors had actually run out of rock. Cox further testified that the contract did not anticipate any excavation of excess rock and so Steelman–Duff was forced to finance the additional excavation. Once Steelman–Duff learned of the excess rock, it proposed a schedule for excavation; when Seubert asked Steelman–Duff to accelerate the schedule, Steelman–Duff complied. On the other hand, the testimony of Seubert employees tended to show that Steelman–Duff was well aware of the excess rock and left the project anyway. We are mindful of the regard that we shall give the special opportunity of the district court to judge the credibility of the witnesses who appear personally before it. I.R.C.P. 52(a). We therefore conclude that substantial and competent evidence supports the district court's finding of due diligence.

■ Seubert then contends that the district court did not make findings as to Steelman–Duff's failure to comply with the other contractual provisions, and that this cause should be remanded for such findings. We disagree. The district court found that various actions by all parties contributed to the delayed completion of the project and that Seubert and Steelman–Duff both deviated from the progress schedule. The district court nevertheless concluded that such delays and deviations did not breach either Seubert's or Steelman–Duff's contractual obligations. Although the testimony is admittedly conflicting, substantial and competent evidence supports the district court's findings. Since Steelman–Duff apparently left the work site without knowing that further excavation was required, Steelman–Duff cannot be said to have voluntarily slowed or shut down the operations of the project. Moreover, Steelman–Duff completed its performance of the contract well before its deadline and the project deadline. Even without further findings on the part of the district court, the record in this case is clear and yields an obvious answer to the relevant question.

*Pope v. Intermountain Gas Co.,* 103 Idaho 217, 225, 646 P.2d 988, 996 (1982).

■ Seubert argues that since the district court found that both Seubert and Steelman–Duff delayed completion of the project, the liquidated damages and engineering costs should at least be allocated between Seubert and Steelman–Duff. This Court has ruled, however, that a general contractor cannot recover from its subcontractor for delay under a liquidated damages clause where the general contractor contributed to the delay by failing to perform a contractual duty, such as failing to provide adequate equipment. *City of Idaho Falls v. Beco Constr. Co.,* 123 Idaho 516, 521, 850 P.2d 165, 170 (1993); *State v. Jack B. Parson Constr. Co.,* 93 Idaho 118, 120, 456 P.2d 762, 764 (1969).

One of the standard specifications applicable to this project stated as follows:

The contractor [Seubert] shall construct 0.35 foot minimum depth of crushed surfacing on each section of grading *immediately* following completion of the sub-grade as specified in the special provision entitled "Crushed Surfacing Placement."

(Emphasis added).

Because Steelman–Duff wished to begin excavation of the existing roadway as soon as possible, Seubert promised to bring the large crusher to the construction site to crush rock for the gravel covering. Indeed, Seubert was scheduled to produce and place this gravel in early April. Consequently, Steelman–Duff began its excavation in early April. It is undisputed, however, that the large crusher did not arrive at the construction site until late April and that Seubert did not apply gravel to the subgrade until May 4, over a month after Steelman–Duff began to excavate the roadway.

The district court found that Seubert's delay in providing the large crusher was not a breach of the construction contract, primarily because schedule changes and delays occurred throughout the course of the project. Even so, however, Seubert cannot contest the fact that the failure to bring the large crusher on-site earlier was a failure to pro-

vide adequate equipment, was not in compliance with the provision quoted above, and contributed to the overall delay of the highway reconstruction project. We uphold the determination by the district court, therefore, that Seubert may not recover the liquidated damages and engineering costs from Steelman–Duff.

## II. Was the award of prejudgment interest correct?

In its memorandum decision, the district court awarded Steelman–Duff prejudgment interest on its claim of $10,622.93 from September 12, 1983, which was Steelman–Duff's last day of performance of the contract. The district court later amended its ruling by awarding Steelman–Duff prejudgment interest on $9,590.93 from August 27, 1984, based on a letter of that date from Seubert to Steelman–Duff. The letter stated, in relevant part:

> Attached is our check in the amount of $58,309.97 for payment on the above referenced project. Below is a breakdown on how this amount was arrived at.
>
> . . . .
>
> This leaves $10,622.93 that we have withheld for liquidated damages. There are also backcharges on both sides for work performed and equipment used.

Seubert contends that the subcontract with Steelman–Duff established a "mutual account" between the two contractors, upon which prejudgment interest may not be awarded until ascertainment of the balance. Idaho Code § 28–22–104.5.[1] Because the arguments of both parties display a fundamental misapprehension of mutual and open accounts, we explain the significance of such accounts here.

█ Courts sometimes treat open and mutual accounts as substantially synonymous expressions. 1 Am.Jur.2d *Accounts and Accounting* § 4 (1962). An open account refers to a continuing series of transactions between the parties, where the balance is unascertained and future transactions between the parties are expected. *Id.* Where there are items debited and credited on both sides of the open account, rather than one party always in debt and the other extending credit, the account is called a mutual open account. *Id.,* § 5. There must also be a mutual agreement, express or implied, that the claims upon the one side and the other are to be set off against each other. *Id.* Employment relationships may give rise to mutual open accounts; thus when a farmhand was paid at irregular intervals, minus the value of items furnished him by his employer, this Court found that a mutual open account existed. *McCarthy v. Paris,* 46 Idaho 165, 171, 267 P. 232, 233 (1928); *see also Kugler v. Northwest Aviation, Inc.,* 108 Idaho 884, 887, 702 P.2d 922, 925 (Ct.App.1985) (ordering district court on remand to find whether open account was mutual or unilateral). When, however, only one party to the transaction extends credit to the other, the account is not mutual. *Van de Wiele v. Koch,* 256 Or. 349, 352–53, 472 P.2d 803, 805 (1970).

█ The subcontract agreement between Seubert and Steelman–Duff stated in relevant part:

**16. Partial Payment.**

Partial payment for work performed under this agreement will be made by the CONTRACTOR as and within ten days of the time he is paid therefor by the PRINCIPAL, and will equal the value of the work done by the SUBCONTRACTOR according to the Engineer's estimate of the said unit, or lump sum, prices, less the sum of previous payments and less a percentage equal to the percentage retained by the PRINCIPAL, *PROVIDED, that if the SUBCONTRACTOR is indebted to the CONTRACTOR or anyone else for cash,*

---

**1.** Idaho Code § 28–22–104. Legal rate of interest.—(1) When there is no express contract in writing fixing a different rate of interest, interest is allowed at the rate of twelve cents ($.12) on the hundred by the year on:

1. Money due by express contract.
2. Money after the same becomes due.
3. Money lent.

4. Money received to the use of another and retained beyond a reasonable time without the owner's consent, express or implied.
5. Money due on the settlement of mutual accounts from the date the balance is ascertained.
6. Money due upon open accounts after three (3) months from the date of the last item.

*advances, supplies, materials, equipment, rental, or other proper charges against the work, the amount of such indebtedness may be deducted from any payment or payments made under this provision.* (emphasis added).

The subcontract agreement clearly contemplates that Steelman–Duff would be indebted to Seubert during the course of the project. Even if the subcontract formed a mutual account, however, the district court was correct in establishing prejudgment interest from August 27, 1984, for at least two reasons. First, Seubert's attorney asserted at oral argument that Seubert's letter of August 27, 1984 did not refer to the items included in the subcontract. Thus, we find that the sums which were withheld from Steelman–Duff as of August 27, 1984 constituted "money due by express contract," prejudgment interest on which is due pursuant to I.C. § 28–22–104.1. Even if the items enumerated in the August 27 letter did relate to the items specified in the subcontract, substantial and competent evidence still supports the conclusion of the district judge that the balance of the accounts was ascertained as of that date, since the withheld sum has not been subsequently amended.

Notwithstanding Seubert's arguments to the contrary, our decision today is consistent with our recent decision in *Ervin Constr. Co. v. Van Orden*, 93.18 I.S.C.R. 993, 997–98, 125 Idaho 695, 702–704, 874 P.2d 506, 513–515 (Aug. 25, 1993). In *Ervin*, we reversed the trial court's award of prejudgment interest because the *principal* amount of liability under the contract was unascertainable. *Id.* at 704, 874 P.2d at 515. Here, the principal amount of liability was ascertained by Seubert's own letter of August 27, 1984. Accordingly, we affirm the district court in its award of prejudgment interest.

III. Did the district court err in reopening the evidence to admit the bond and in ruling that Steelman–Duff was a third party beneficiary of the bond?

Seubert challenges the admission into evidence of the bond executed by Wausau and Steelman–Duff's notice of completion of its public works contract, and the ruling by the district court that Steelman–Duff was a third party beneficiary of the bond. The bond in this case was both a payment and performance bond, stating in relevant part:

NOW, THEREFORE, if the Principal herein shall faithfully and truly observe and comply with the terms, conditions and provisions of said contract in all respects and shall well and truly and fully do and perform all matters and things by it undertaken to be performed under said contract, upon the terms proposed therein, and within the time prescribed therein, and until the same is accepted, and *shall pay all laborers, mechanics, subcontractors* and materialmen and all persons who shall supply such contractor or subcontractors with provisions and supplies for the carrying on of such work, and shall in all respects faithfully perform said contract according to law, then this obligation to be void, otherwise to remain in full force and effect ...

(Emphasis added.)

■ This Court has recognized that reopening a case and taking new evidence prior to entry of judgment is within the discretion of the district court and will not be reversed on appeal absent a showing of abuse. *See, e.g., Davison's Air Serv., Inc. v. Montierth,* 119 Idaho 967, 968, 812 P.2d 274, 275 (1991). When an exercise of discretion is reviewed on appeal, we ask (1) whether the lower court correctly perceived the issue as one of discretion, (2) whether the court acted within the outer boundaries of such discretion and consistently with any legal standards applicable to specific choices, and (3) whether the court reached its decision by an exercise of reason. *Sun Valley Shopping Center, Inc. v. Idaho Power Co.,* 119 Idaho 87, 94, 803 P.2d 993, 200 (1991).

■ Seubert argues that the bond should not have been admitted because the third-party beneficiary issue was neither pled nor proven at trial. We hold, however, that the district court acted within its discretion. Steelman–Duff named Wausau as an additional party on Steelman–Duff's counterclaim against Seubert. Steelman–Duff incorporated all allegations in its complaint into the

claim against Wausau, alleged that the contract bond executed by Seubert and Wausau guaranteed payment of all subcontractors, and alleged that Wausau was indebted to Steelman–Duff for all damages, interest thereon, costs, and attorney fees. Seubert later stipulated to adding Wausau as a party to the action, replied to Steelman–Duff's counterclaim on Wausau's behalf, and acknowledged the existence of the contract bond. Furthermore, the Notice of Claim to Wausau, filed pursuant to the provisions of the bond, was admitted into evidence during the trial. Wausau therefore was adequately notified of Steelman–Duff's claim, and we affirm the granting of Steelman–Duff's motion by the district court.

Seubert then argues that the Court of Appeals incorrectly applied Washington law when it held that Steelman–Duff was a third party beneficiary of the bond, and that the determination that the bond was executed pursuant to Washington law constituted a finding of fact that was not made by the district court. Even without an express finding, however, the record in this case clearly establishes that the bond was executed pursuant to Washington law. *See Pope v. Intermountain Gas Co.,* 103 Idaho at 225, 646 P.2d at 996. Furthermore, it is a principle of Idaho law that the obligation of a surety on a bond required by statute is determined by the obligations and purposes set forth in the statute. *Bryant Motors, Inc., v. American States, Inc.,* 118 Idaho 796, 798, 800 P.2d 683, 685 (Ct.App.1990); *see Minidoka County v. Krieger,* 88 Idaho 395, 407–08, 399 P.2d 962, 969–70 (1965); *see also City of Weippe v. Yarno,* 96 Idaho 319, 528 P.2d 201 (1974). Wausau invites this Court to ignore this clear principle, construe the bond without looking to the relevant Washington statute, and hold that an unpaid subcontractor cannot maintain a third party beneficiary cause of action against the surety. We decline this invitation, particularly since this Court has long held that unpaid subcontractors are third party beneficiaries of performance and payment bonds which are virtually identical to the one at bar and which are executed by guarantors in favor of the owners of particular projects. *See Minidoka County v. Krieger,* 88 Idaho at 413, 399 P.2d

at 976; *City of Weippe v. Yarno,* 96 Idaho at 321, 528 P.2d at 203.

The Washington public contracts bond statute requires a general contractor to furnish a bond to the state of Washington conditioned on the payment of all laborers, mechanics, and subcontractors, and provides such persons "a right of action in his, her, or their own name or names on such bond for work done." R.C.W. 39.08.010, 39.08.030. In light of this statute and Idaho law, we affirm the district court ruling that Steelman–Duff was an intended third party beneficiary of the bond that was executed by Wausau.

The district court has the discretion to award attorney fees against Wausau pursuant to I.C. § 41–1839 as appear reasonable. Because this is within the court's discretion, we will not overturn on appeal the award of attorney fees that Judge Schilling granted.

### IV. Did the district court err in denying Seubert's claim for overpayment?

The district court held that Seubert was not entitled to recover an alleged overpayment to Steelman–Duff of $977.60 on the grounds that Thomas Reiner, Seubert's office manager, had testified that the overpayment was "inadvertent" and that Reiner's testimony, the facts, and the exhibit which displayed the overpayment figure did not constitute a preponderance of the evidence.

We reverse this ruling because it was clearly erroneous. I.R.C.P. 52(a). Reiner testified, without objection or rebuttal, to a standard procedure in payments for construction contracts. The record does not illustrate that his testimony was inherently improbable, nor did facts or circumstances disclosed at trial render it so. Therefore, this Court must accept his testimony as true. *Smith v. Idaho State Univ. Fed. Credit Union,* 114 Idaho 680, 685, 760 P.2d 19, 24 (1988) (citations omitted). Since no evidence contradicted Reiner's testimony and exhibit, the finding by the district court as to this issue was unsupported by substantial and competent evidence.

**V. Did the district court err in denying Seubert's claim for stockpiling costs?**

During Steelman–Duff's absence from the work site, Seubert stockpiled the rock that it crushed. Seubert contends that Steelman–Duff's absence increased these stockpiling costs by $5,000. The district court held that because Steelman–Duff did not breach its contract, it was not liable for Seubert's "reasonable cost" of job performance. Because we affirm the district court in its determination that Steelman–Duff complied with its subcontract, we likewise affirm the district court's ruling that Steelman–Duff is not liable for Seubert's stockpiling costs.

## CONCLUSION

We reverse the ruling of the district court that Seubert did not prove its claim of overpayment and affirm the remainder of the district court's findings and conclusions. We remand the cause for entry of a modified judgment consistent with these rulings. Costs and attorney fees pursuant to I.C. § 41–1839 awarded to Steelman–Duff.

McDEVITT, C.J., JOHNSON, J., and MICHAUD and BURDICK, Justices Pro Tem, concur.