# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40234

| | | |
|---|---|---|
| CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, fka CREDIT SUISSE, CAYMAN ISLANDS BRANCH, | ) ) ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | Boise, January 2014 Term |
| | ) | |
| TEUFEL NURSERY, INC., | ) | 2014 Opinion No. 37 |
| | ) | |
| Defendant-Appellant, | ) | Filed: March 19, 2014 |
| | ) | |
| and | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| ACTION GARAGE DOOR, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Valley County. Hon. Patrick H. Owen, District Judge.

The judgment of the district court is <u>affirmed</u>.

Pickens Law, P.A., Boise, for appellant. Terri R. Pickens argued.

Moffatt, Thomas, Barrett, Rock & Fields, Chartered, Boise, Sidley Austin LLP, Los Angeles, California, and Fabian & Clendenin, Salt Lake City, Utah, for respondent. P. Bruce Badger argued.

_____

J. JONES, Justice

This appeal concerns the priority of liens as between Teufel Nursery's mechanics lien and Credit Suisse's mortgages. The district court held that while Teufel had a valid and enforceable lien, it was inferior to Credit Suisse's mortgages. On appeal, Teufel argues that such holding was in error and that the district court also erred in calculating Teufel's lien amount, interest, and attorney fees. We affirm.

1

# I.
## FACTUAL AND PROCEDURAL HISTORY

This appeal stems from the failure of Tamarack Resort ("Resort"), which was owned, developed, and operated by Tamarack Resort, LLC ("Tamarack"). The Resort was slated as a year-round community, complete with cross-country and downhill skiing, a championship golf course, hotel and conference facilities, retail shopping, restaurants, and lounges. Tamarack planned to offer a panoply of real estate options, including custom homes, condominiums, townhomes, chalets, and cottages. In 2003, construction at the Resort began. Housing units were built and sold, hotel facilities were developed, and by 2006, the ski areas, golf course, retail shops, and restaurants were up and running. In 2004, Tamarack hired Teufel Nursery as its landscape developer. Teufel provided landscaping services at the Resort from 2004 until early 2008.

On May 19, 2006, Tamarack obtained a loan in the amount of $250,000,000.00 from a group of lenders, one of which was Credit Suisse. The loan allowed Tamarack to refinance its existing debt, pay accounts receivable, and continue developing the Resort. The loan was secured by two mortgages, which were recorded in Valley County on May 19, 2006. In 2007, Tamarack began to experience significant financial difficulties. Soon thereafter, it defaulted on its loan from Credit Suisse.

In August of 2007, Tamarack also fell behind on its payments to Teufel. At this time, Tamarack approached Teufel about modifying their existing 2007 agreement. Tamarack presented Teufel with a Master Construction Services Agreement ("Master Agreement") that would constitute their sole agreement. However, the Master Agreement was never accepted or executed by Teufel. As Teufel explained, its extant "2007 Landscape Construction Agreement [with Tamarack] already established the material unit prices and hourly rates so Teufel did not feel it was necessary to modify its agreement with Tamarack." Teufel continued working at the Resort until early 2008, even though by that time it had not been paid for several months. On March 21, 2008, Teufel recorded its Claim of Lien against certain Resort properties in the amount of $564,560.23. The lien amount was adjusted to $406,199.07 at trial because, according to Teufel, when its former counsel filed a complaint to foreclose, he failed to name certain property owners in the lawsuit. As a result of such omissions, "many of the parcels in Teufel's Claim of Lien were subsequently released without payment to Teufel."

2

Credit Suisse filed its complaint for foreclosure of mortgages in Valley County on March 11, 2008. Teufel was named as a defendant when Credit Suisse filed its amended complaint in the action on August 28, 2008. Shortly thereafter, Teufel filed its own complaint for foreclosure on its lien, naming Credit Suisse as a defendant. On October 17, 2008, the district court entered an order consolidating the Credit Suisse and Teufel lawsuits, along with other pending mechanics lien suits. On February 10, 2009, the district court entered an order requiring all of the mechanics lien claimants to file a disclosure form within twenty-one days. The disclosures were to include the claimant's controlling contract(s), as well as the date on which the claimant first provided labor and material to the property, and each claimant's purported priority date. That same day, Teufel's former counsel of record filed Teufel's disclosure form in which he listed various dates in 2007 as its lien priority dates. At that time, Teufel also identified twenty-seven recorded partial releases of its lien claim. On March 3, 2009, Teufel filed an amended disclosure form, which again listed various dates in 2007 as its lien priority dates. This amended disclosure form utilized an alphabetized parcel system to identify those properties upon which it sought to foreclose, and it allocated the alleged amounts owing on each parcel. In June of 2009, Teufel then filed a supplemental disclosure form and attached the Master Agreement as the controlling contract between Teufel and Tamarack.[1]

On June 30, 2009, new counsel entered an appearance on Teufel's behalf. After Credit Suisse filed a motion for summary judgment based on the lien priority dates in Teufel's disclosure forms, but prior to the time set for argument, Teufel's new counsel filed a second amended lien disclosure form wherein the priority dates were amended from the 2007 dates to June 14, 2004. It was via this second amended lien disclosure form, filed on September 25, 2009, that Teufel first asserted that it provided labor and materials for the Resort beginning in 2004. In conjunction with its opposition to Credit Suisse's summary judgment motion, Teufel submitted the affidavit of Rick Christensen, Teufel's Landscape Division Manager. In his affidavit, Christensen identified four separate Landscape Construction Agreements—dated in 2004, 2005, 2006, and 2007—as the contracts that governed the relationship between Teufel and Tamarack.

---

[1] Section 10.3 of the Master Agreement provided: "This Master Agreement is the sole agreement between the parties with respect to the subject matter herein and supersedes all prior negotiations, representations or agreements, either written or oral." Teufel subsequently abandoned the contention that the Master Agreement was the operative contract between the parties and we therefore do not consider it to have any bearing on the outcome of this case.

The district court ultimately denied Credit Suisse's motion for summary judgment finding there was a genuine issue of material fact regarding Teufel's priority date.

Teufel filed its own motion for summary judgment on April 29, 2010, asserting that based on its priority date of June 14, 2004, it had priority over the Credit Suisse mortgages. The district court denied Teufel's motion for the same reason it had denied Credit Suisse's—there was a genuine issue of material fact as to Teufel's priority date.

A court trial regarding the validity, priority, and amount of Teufel's lien was held on October 5 and 6, 2010. On May 11, 2011, the district court entered its Omnibus Findings and Conclusions Re: Validity, Priority and Amount of Various Lien and Mortgage Claims ("Omnibus Order"). In the Omnibus Order, the district court determined that: (1) Teufel's claim of lien is valid and enforceable; (2) Teufel's lien claim is inferior to the Credit Suisse mortgages; and (3) Teufel's claim of lien amounts to $122,066.98. Subsequently, Teufel filed a motion to clarify, followed by a motion to reconsider. Credit Suisse filed its own motion to clarify. On July 28, 2011, the district court entered orders granting the motions to clarify but denying Teufel's motion to reconsider. As a result of granting the motions to clarify, and to correct certain clerical errors and omissions, the district court entered its Substitute Omnibus Findings and Conclusions Re: Validity, Priority and Amount of Various Lien and Mortgage Claims ("Substitute Omnibus Order").

With regard to the subject matter of this appeal, the only substantive change reflected in the Substitute Omnibus Order was the district court's calculation of Teufel's lien amount. In its Substitute Omnibus Order, the district court increased Teufel's lien amount to $306,543.30, or $184,476.32 more than the original $122,066.98 awarded in the Omnibus Order. This increase was based on Teufel's argument in support of its motion to clarify that it had an additional $184,476.32 lien on a certain parcel that the district court had failed to take into account in its Omnibus Order.

On September 27, 2011, Teufel filed a motion seeking prejudgment interest in the amount of $99,911.62, as well as a default judgment against Tamarack for the full amount of the claim of lien, plus interest, costs, and attorney fees. On December 12, 2011, the district court entered default judgment against Tamarack and in favor of Teufel in the amount of $993,686.17—the full amount of Teufel's original claim of lien, prejudgment interest, costs, and attorney fees. Subsequently, on February 3, 2012, the district court entered its Memorandum

4

Decision and Order Re: Various Requests for Awards of Attorneys' Fees, Costs and Prejudgment Interest ("Order Re: Attorney Fees"). Therein, the district court found that Teufel had only partially prevailed as against Credit Suisse, and thus apportioned its attorney fees and costs "by subtracting forty percent . . . from the overall amount." After subtracting forty percent, the district court ended up awarding attorney fees to Teufel in the amount of $162,775.20, costs as a matter of right in the amount of $4,329.23, discretionary costs in the amount of $4,865.56, and prejudgment interest calculated at a variable rate in the amount of $63,153.30.

On June 18, 2012, the district court entered its Memorandum Decision and Order: Re: Proposed Judgments and Decrees of Foreclosure and Orders for Sale, as well as its Second Amended Second Revised Judgment and Decree of Foreclosure and Order of Sale ("Second Amended Order"). The Second Amended Order contained a certificate of final judgment consistent with I.R.C.P. 54(b). Teufel filed a timely notice of appeal, which indicated that it was appealing both the Substitute Omnibus Order and the Second Amended Order. Its briefing reflects that it is also appealing findings made by the district court in its Order Re: Attorney Fees.

## II.
## ISSUES ON APPEAL

I. Whether the district court erred in holding that Credit Suisse's mortgages have priority over Teufel's claim of lien.

II. Whether the district court erred in calculating Teufel's lien amount.

III. Whether the district court erred in calculating Teufel's prejudgment interest award.

IV. Whether the district court erred in calculating Teufel's costs and attorney fees.

## III.
## ANALYSIS

### A. Standard of Review

The Court has previously articulated the appropriate standard of review as follows:

This Court limits its review of a trial court's decision to determining "whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions of law." Unless the trial court's findings of fact are clearly erroneous, they will not be set aside. Accordingly, "even if the evidence is conflicting, if the findings of fact are supported by substantial and competent evidence [we] will not disturb those findings on appeal." Conversely, when reviewing a trial court's conclusions of law, "this Court is not bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented."

*City of Meridian v. Petra Inc.*, 154 Idaho 425, 434–35, 299 P.3d 232, 241–42 (2013). Additionally, interpreting an unambiguous contract is a question of law and subject to free review. *Id*. at 435, 299 P.3d at 242.

With regard to the issue of the lien amount, "[a] district court's findings of fact in a court-tried case will be liberally construed on appeal in favor of the judgment entered, in view of the district court's role as trier of fact." *Franklin Bldg. Supply Co. v. Sumpter*, 139 Idaho 846, 849, 87 P.3d 955, 958 (2004). Indeed, "[i]f the findings of fact are based on substantial evidence, even if the evidence is conflicting, they will not be overturned on appeal." *Id.*

A district court's determination of a reasonable attorney fee under I.C. § 45-513 is a factual determination to which this Court applies an abuse of discretion standard of review. *Elec. Wholesale Supply Co., Inc. v. Nielson*, 136 Idaho 814, 824, 41 P.3d 242, 252 (2001). Thus, the Court must inquire "(1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason." *Id.*

### B. The district court did not err in holding that Credit Suisse's mortgages have priority over Teufel's claim of lien.

This Court has held that when "a lien is filed within ninety days after the completion of the labor or services, the lien may encompass the entirety of the work performed under a single contract." *Terra-West, Inc. v. Idaho Mut. Trust, LLC*, 150 Idaho 393, 400, 247 P.3d 620, 627 (2010). Therefore, the determination of this case depends on whether one continuous contract controlled, or whether Teufel's relationship with Tamarack was in fact governed by four separate contracts.

The district court ultimately found that Teufel's claim of lien was inferior to Credit Suisse's mortgages because "the work that Teufel performed in 2007 was not done as part of Teufel's 2004 contract." Instead, the district court found that Teufel and Tamarack's relationship was governed by four distinct contracts and that "[t]he priority for Teufel's claim of lien relates back to when Teufel first provided labor or materials for the work specified in the 2007 contract." This determination by the district court was essentially the *coup de grace* to Teufel's case because Tamarack's "property value is almost certainly much less than the total of claims,

6

[and therefore] it is unlikely that any lien claimant whose interest is inferior or subordinate to Credit Suisse will receive any part of the foreclosure proceeds."

On appeal, Teufel asserts that the district court made erroneous findings of fact that led to incorrect conclusions of law. Primarily, Teufel takes issue with the district court's finding that Teufel's work was governed by four separate contracts. Teufel argues that, based on this erroneous factual finding, the district court's conclusion of law should be reversed. Credit Suisse counters that there was substantial and competent evidence to support the district court's findings of fact and conclusions of law.

**1. Substantial, competent evidence supports the district court's finding that four separate contracts—as opposed to one continuous contract— governed the relationship between Teufel and Tamarack.**

At trial, Teufel was unable to provide signed copies of any of its operative agreements with Tamarack. However, the district court found, based on the trial evidence, that unsigned copies of the 2004, 2005, 2006, and 2007 contracts offered into evidence by Teufel were the operative agreements between the parties. In its analysis, the district court first looked to the 2004 contract. It found that the scope of work—which enumerated eleven specific projects and also contained one general provision allowing for the completion of "such other tasks as may be directed by the Owner's Representative"—was plain and unambiguous. The district court then found that the 2005, 2006, and 2007 contracts were not renewal contracts because each had a "new scope of work and a substantial completion date." But more than that, after examining each contract's language, the district court stated:

> There is nothing in the agreements that required Tamarack to employ Teufel in subsequent years. There is nothing in the 2004 contract that obligates either Tamarack or Teufel beyond the 2004 contract. Teufel was under no obligation to accept future work and Tamarack had no obligation to award the work to Teufel.

On appeal, however, Teufel argues, "the contracts entered into in 2005, 2006 and 2007 were not separate contracts but modifications and extensions of the 2004 Landscape Construction Agreement." In support of this contention, Teufel asserts the following: (1) Teufel was hired as the exclusive landscape company; (2) during negotiations Tamarack represented that the project would be a multiyear project; (3) drafting a multiyear contract was "impossible because there was no [landscape] plan to provide the basis for the contract"; (4) the yearly agreements were drafted to allow for changes in plant material and costs; (5) Teufel worked at Tamarack outside the dates contemplated in the yearly agreements; (6) Teufel worked outside

7

the scope of work included in each yearly agreement; (7) most of the projects were multiyear endeavors; and (8) "[t]he plain language of the 2005, 2006 and 2007 [agreements] demonstrates that the contracts were extensions of previous contracts."

Credit Suisse counters that there was substantial evidence to support the district court's finding that Teufel had four separate agreements as opposed to a single continuous contract. Specifically, Credit Suisse points out that Tamarack's project manager Rick Christensen "testified that his company required a signed written contract each year as a condition to its own commitment to its local growers to purchase trees and shrubs." Moreover, Credit Suisse argues, Tamarack employee Chris Kirk testified that Teufel wanted a signed contract "because it was a huge financial commitment for Teufel" and "[t]hey wanted a comfort level that [Tamarack] was going to be able to provide payment." Most importantly, Credit Suisse says, was the district court's reliance on the language contained in the yearly agreements themselves. Credit Suisse argues that the plain language in the yearly agreements make it clear that the 2005, 2006, and 2007 contracts were not extensions or modifications of the 2004 contract.

The Court's "primary objective when interpreting a contract is to discover the mutual intent of the parties at the time the contract is made." *Straub v. Smith*, 145 Idaho 65, 69, 175 P.3d 754, 758 (2007). When feasible, "the intent of the parties should be ascertained from the language of the agreement as the best indication of their intent." *Id*. Whether a contract is ambiguous—*i.e.* reasonably subject to conflicting interpretations—is a question of law. *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 190, 108 P.3d 332, 337 (2005). Moreover, "[a]n unambiguous contract will be given its plain meaning." *Id*. Here, neither party suggests that the 2004 contract is anything but unambiguous. And, the district court found that the 2004 contract was unambiguous. As an unambiguous contract, "its interpretation and legal effect are questions of law." *Id.*

This brings us to the plain language of the contracts. First, a reading of the 2004 contract yields no language that suggests that Teufel was obligated to work during any time other than from the date the agreement was entered into, June 4, 2004, to when it was required to "achieve substantial completion of the entire Work not later than November 30, 2004." The scope of work in the 2004 contract was as follows:

> The Owner and Contractor acknowledge that no landscape plans or specifications for Project have been created and, therefore, the Contractor's scope of Work shall

be to perform all grading, landscaping, restoration, irrigation and related site work for the following projects:

1. Twenty (20) "Twin Creek" Chalets;
2. Eighteen (18) "Discovery" Chalets;
3. Twenty-four (24) Cottages;
4. Pioneer Village, including the irrigation and seeding of the snow front;
5. Ski-over and Ski-under bridges (including retaining walls);
6. Discovery Drive, including key intersections thereon;
7. Roundabouts for Whitewater Road and West Valley Road;
8. Pinnacle Place and Sugarloaf Road;
9. The Dining Yurt and existing Recreation Yurt areas;
10. Screening of parking at the entrance and other parking overflow areas;
11. At Owner's direction, screening of specific utilities throughout the Project; and
12. Such other tasks as may be directed by the Owner's Representative.

Similarly, the 2005 contract was entered into on April 12, 2005 and required Teufel to "achieve substantial completion of the entire Work not later than December 31, 2005." The scope of work in the 2005 contract included some overlap with the scope of work outlined in the 2004 contract, including the following:

1. Finish landscape installation for 20 Twin Creek Chalets and Rock Creek Cottages
. . .
3. Complete landscaping for the Entry & Whitewater Roundabouts

Likewise, the 2006 contract was entered into on May 16, 2006 and Teufel was to substantially complete the work by December 31, 2006. The 2006 contract's scope of work includes the following: "Completion of the landscape for the Bayview Sales Mod." Finally, the 2007 contract was entered into on May 2, 2007 and Teufel was to substantially complete the work by December 31, 2007. The 2007 contract includes "[c]ompletion of Golden Bar Townhomes" within the scope of work.

The district court's factual finding that four separate contracts controlled was supported by substantial, competent evidence. Teufel asserts that "[t]he plain language of the 2005, 2006 and 2007 [contracts] demonstrates that the contracts were extensions of previous contracts." Teufel argues that the language used in the scope of work sections, in particular "finish," "complete," and "completion," is "a clear indicator that the work was ongoing, uniform and one part of the same improvement." By making this argument, Teufel seeks to expand the definition of "finish" and "complete" beyond their plain meanings. Hypothetically, Teufel could have been

"finishing" or "completing" another nursery's prior work—and in that scenario, a second contract that provides for the completion of another's work certainly would not be deemed an extension of the first contract between Tamarack and another nursery. Simply put, there is no language of modification or extension within any of the yearly contracts. Including uncompleted projects from prior years within the scope of work does not change that.

Moreover, the additional evidence submitted by Teufel cannot override the plain language of the agreements. In essence, each of Teufel's remaining arguments attempts to do just that. For example, Tamarack indicated that Teufel would be the exclusive landscaper and that the project would cover multiple years. The district court agreed with this, finding that "Tamarack desired to have the same landscape contractor for the entire project. Teufel expected to be the landscape contractor for the entire project." Importantly, though, the district court noted that that "intent or expectation was not made part of any binding agreement between Tamarack and Teufel." Teufel's argument that drafting a multiyear contract was "impossible" is unconvincing, especially in light of the fact that the Master Agreement presented to Teufel by Tamarack provided that it would "automatically renew for additional one (1) year periods unless either party notifies the other party in writing of its intent not to renew . . . ." Although Teufel rejected the Master Agreement, the language in the proposal demonstrates that drafting a multiyear contract was actually as simple as including explicit language to that effect. Teufel's claims that it worked at Tamarack outside the dates contemplated in each of the yearly contracts and beyond the scope of work provided therein may be accurate, but again, the actual services provided and the dates they were provided does not somehow transform the 2005, 2006, and 2007 contracts into extensions or modifications of the 2004 contract.

The district court's determination that Teufel's relationship with Tamarack was governed by four separate contracts was supported by substantial and competent evidence, namely, the plain language of the contracts themselves.

### 2. Teufel and Tamarack's relationship was not governed by an open account.

Teufel also argues that it had one continuous contract with Tamarack based upon an open account. Although Teufel did raise this argument below, the district court did not address whether an open account was in play in this case. The district court's failure to address this argument is not problematic because the record yields an obvious answer to the relevant

question. *See Kugler v. Northwest Aviation, Inc.*, 108 Idaho 884, 887, 702 P.2d 922, 925 (Ct. App. 1985) (finding that the question of whether an open account existed would need to be determined on remand by the trial court because the Court could only overlook the trial court's omission of that finding "where the record is clear, and yields an obvious answer to the relevant question") (internal citations omitted). Here, the record is clear.

An action on an open account is "a particularized type of contract claim." *Beco Const. Co., Inc. v. Harper Contracting, Inc.*, 130 Idaho 4, 8, 936 P.2d 202, 206 (Ct. App. 1997). "An open account refers to a continuing series of transactions between the parties, where the balance is unascertained and future transactions between the parties are expected." *Seubert Excavators, Inc. v. Eucon Corp.*, 125 Idaho 409, 415, 871 P.2d 826, 832 (1994). "Where an open account exists the parties are deemed to intend that individual items on the account will not be viewed separately but that the account will be considered as a connected series of transactions." *Kugler*, 108 Idaho at 887, 702 P.2d at 925. Indeed, "[w]here materials are furnished for the same . . . improvement in installments and at intervals, and the parties intend them to be included in one account in settlement, the entire account will be treated as a continuous and connected transaction, and the lien limitation begins to run from the last item of the contract." *Valley Lumber & Mfg. Co. v. Driessel*, 13 Idaho 662, 670, 93 P. 765, 768 (1907).

The agreement between Teufel and Tamarack does not constitute an open account. While future transactions between the parties may have been expected, any balances by definition could not have been "unascertained," because it is undisputed that "Tamarack paid Teufel in full for all amounts billed in 2004, 2005, and 2006." Moreover, nothing in the 2004 agreement, or the other yearly agreements, indicates that an open account—rather than the plain, unambiguous words in the yearly agreements themselves—would govern the relationship between Teufel and Tamarack.[2] Again, when the language of a contract is unambiguous, "the meaning of the contract and intent of the parties must be determined from the plain meaning of the contract's own words." *City of Idaho Falls v. Home Indem. Co.*, 126 Idaho 604, 607, 888 P.2d 383, 386 (1995). Thus, whether Teufel and Tamarack actually intended for their relationship to be governed by an open account is irrelevant—not to mention doubtful based on the record—because the plain language within the yearly agreements does not express that intent.

---

[2] Had Teufel not insisted on discrete one-year contracts, its argument would have been more persuasive. But it was Teufel who insisted on one-year contracts from the outset.

### 3. Based on its factual findings, the district court did not err in concluding that Credit Suisse's mortgages have priority over Teufel's claim of lien.

Based on the district court's factual findings, its resulting legal conclusion—that Credit Suisse's mortgages have priority over Teufel's claim of lien—was correct. Idaho Code § 45-506 governs the priority between a mechanics lien and a mortgage. It provides:

> The liens provided for in this chapter shall be on equal footing with those liens within the same class of liens, without reference to the date of the filing of the lien claim or claims and are preferred to any lien, mortgage or other encumbrance, which may have attached subsequent to the time when the building, improvement or structure was commenced, work done, equipment, materials or fixtures were rented or leased, or materials or professional services were commenced to be furnished; also to any lien, mortgage, or other encumbrance of which the lienholder had no notice, and which was unrecorded at the time the building, improvement or structure was commenced, work done, equipment, materials or fixtures were rented or leased, or materials or professional services were commenced to be furnished.

I.C. § 45-506. The Court has interpreted this provision to mean "that the lien claimant could be given priority when either the building, improvement or structure was commenced, some entity or individual began to work on the building, improvement or structure, or when the materials or professional services were first furnished." *Ultrawall, Inc. v. Washington Mut. Bank, FSB*, 135 Idaho 832, 835, 25 P.3d 855, 858 (2001). In sum, "whichever of these events occurred first would determine the priority for all liens as against a mortgage lien holder." *Id.*

A mechanic's lien generally "relates back to the date of commencement of the work or improvement of the commencement to furnish the material." *White v. Const. Mining & Mill. Co.*, 56 Idaho 403, 420, 55 P.2d 152, 160 (1936). However, this rule is not without exception. In *Terra-West*, this Court explained that "[c]entral to our analysis [in *White*] was the fact that all of the work claimed under the mechanic's lien was completed pursuant to one continuous employment contract, and therefore, the lien attached at the time the work began and encompassed all work subsequently done under the contract." *Terra-West*, 150 Idaho 393, 400, 247 P.3d 620, 627 (2010). This Court went on to hold: "so long as a lien is filed within ninety days after the completion of the labor or services, the lien may encompass the entirety of the work performed under the contract." *Id.*

Based on these rules, the district court was correct in holding that Credit Suisse's mortgages had priority over Teufel's claim of lien. Teufel apparently had been paid for all of its

work performed in 2004, 2005, and 2006[3]. Teufel's claim of lien was for work performed exclusively in 2007. Therefore, as the district court noted: "For the 2007 work to relate back to 2004, the work must have been such as to constitute a continuous single agreement."[4] Because the district court found that Teufel and Tamarack's relationship was governed by four separate contracts, it found that Teufel's priority date could not relate back to 2004. Since we agree with the district court that four separate contracts controlled, we affirm the district court's holding that Credit Suisse's mortgages were superior to Teufel's claim of lien.

## C. The district court did not err in calculating Teufel's lien amount.

The district court stated that "Teufel's explanation about the amount of the lien claim was confusing and contradictory." Nonetheless, in its Substitute Omnibus Order, the district court found that Teufel met its burden in showing that the lien amount totaled $306,543.30. With regard to Teufel's claim for additional amounts, the devil is in the details, which are rather murky.

On appeal, Teufel argues that the district court "improperly reduced Teufel's lien amount after the trial." More specifically, Teufel contends that "[g]iven the partial lien releases, the amount of Teufel's Claim of Lien should have been confirmed in the amount of $406,199.07, as set forth in Trial Exhibit 9:056." Essentially, Teufel argues that the district court improperly reduced the lien amount, because under I.C. § 45-508 it was not necessary to allocate precise amounts to specific parcels.

---

[3] There was some confusion at oral argument of the appeal as to whether there may have been some retainage owing on some of the contracts but the record does not disclose whether or not retainage remained owing on any of the contracts.

[4] Teufel also seeks to analogize the present case to that of *Hopkins Northwest Fund, LLC v. Landscapes Unlimited, LLC*, 151 Idaho 740, 264 P.3d 379 (2011). *Hopkins*, though, can be easily distinguished. The *Hopkins* case revolved around the application of I.C. § 45-508, which allows a lien claimant to file "a single lien covering multiple improvements under common ownership, but, in order to maintain priority, the lien claimant must designate the amount owing as to each improvement." *Hopkins*, 151 Idaho at 744, 264 P.3d at 383. This Court held that the lien claimant's "work did not constitute multiple improvements as required to trigger the designation requirement of section 508." *Id*. at 746, 264 P.3d at 385. Instead, the Court characterized the claimant's project—landscaping a golf course—as a "single improvement" because (1) the labor and materials provided benefited the entire golf course; and (2) "the work was done pursuant to a single contract." *Id*. Teufel asserts that the landscaping of the Resort was, just like the landscaping of the golf course in *Hopkins*, a single improvement. However, this argument is inapposite because I.C. § 45-508 is not at issue in this case. Therefore, whether Teufel's work constituted a single "improvement" under the meaning of that statute is irrelevant. Even if that inquiry was germane to this appeal, in characterizing Landscapes Unlimited's work on the golf course as a single improvement, this Court weighed heavily on the fact that one single contract controlled. Again, that is not the case here.

13

Credit Suisse argues that Teufel, in certain instances, failed to meet its burden of proof because it was unable to match certain unpaid amounts to parcels that had been liened but not released. It is irrelevant that Teufel apportioned its lien claim, Credit Suisse argues, because "what mattered ultimately was whether Teufel was able to identify whether its work had been performed on one of the parcels that had not been released."

Teufel initially listed the amount owed in its claim of lien at $564,560.23. Credit Suisse disputed the lien amount and the district court ultimately opined that Teufel's evidence at trial "was, in many respects, confusing." It had good reason to characterize Teufel's evidence this way. As the district court explained:

> Teufel's lien was filed against all of the platted property identified in its lien claim. There is an attachment to the claim of lien that apportions the total amount among twenty four (24) described activities, areas or parcels described in the exhibit. . . . There is no information in the lien or the attachment [that] explains how the twenty four (24) activities, areas or parcels described in the exhibit relate to the property that is actually identified in the lien.
> In its Amended Complaint for Foreclosure filed February 10, 2009, Teufel . . . did not seek to foreclose on the twenty four (24) activities, areas or parcels that were described in the attachment to the claim of lien. Rather Teufel alleged that it was seeking to foreclose upon forty four (44) distinct parcels which Teufel identified as parcels A–LL. . . .
> Teufel apparently obtained these parcel descriptions from a litigation guarantee done by Stewart Title Guaranty Company. How Teufel, its counsel and/or Stewart Title determined that these forty four (44) parcels were the parcels that should be foreclosed upon is not fully understood and was not well explained at trial. In any event, in the foreclosure complaint, Teufel sought foreclosure of the parcels using the parcel description from Stewart Title, and not the property described in its claim of lien or the twenty four (24) items listed in the lien attachment. . . . In the lien disclosure forms, Teufel allocated or apportioned its lien claim among the forty four (44) parcels listed in the foreclosure complaint. Teufel also disclosed in the lien disclosure forms that Teufel had recorded partial lien releases affecting twenty seven (27) of the forty four (44) parcels it sought to foreclose. However, the lien disclosures did not detail or explain what effect, if any, the releases would have on Teufel's foreclosure request.

The testimony of Teufel's key witness was also less than clear. Rick Christensen, Teufel's project manager, initially testified that the lien amount was $529,556.47, that he was aware Teufel had released certain liens, but that he "had not had the opportunity to calculate the effect of the releases on the amount claimed in the lien." However, when asked on cross-examination about one of Teufel's trial briefs, in which Teufel claimed that the amount of the lien was $359,244.71 after taking the released liens into account, Christensen testified that the

lien amount should be reduced to $406,199.07, despite his earlier testimony that he had not yet calculated the effect of the released parcels. Further inconsistencies arose when, "on re-direct examination, Christensen produced a type-written summary that he had been referring to during his testimony." This summary indicated that, after taking the released liens into account, the lien amount should be $406,199.07. The discrepancy between the amount in the written summary and the amount in Teufel's trial brief was never explained. Nor was it ever explained why Christensen testified that he had not had a chance to calculate the released parcels' effect on the lien amount while at the same time referring to a written summary that clearly had made those calculations. Moreover, Teufel had listed twenty-seven partial lien releases in its second amended lien disclosure. However, at trial Credit Suisse established that additional releases existed.

The district court's finding that Teufel's lien amount totaled $306,543.30 was supported by substantial evidence, especially in light of the fact that this Court is required to liberally construe a district court's findings of fact in view of its role as the trier of fact. *See Franklin Bldg. Supply Co.*, 139 Idaho at 849, 87 P.3d at 958. Teufel's argument that the district court erred in holding the way it did because Teufel's "retention fees were not properly allocated to specific parcels of property" misreads the district court's analysis. Teufel's problem was not an allocation issue; it was simply an issue of presenting conflicting and confusing evidence. As Credit Suisse points out, it was the dozens of partial lien releases that "proved to be the rub." It remains unclear whether the amount that Teufel asserted to be owed—$406,199.07—took into account the additional partial lien releases that Credit Suisse established at trial. Those partial lien releases—in addition to the twenty-seven disclosed by Teufel—were apparently set out in Trial Exhibit 1:304. However, the actual amounts of the releases are not listed in that exhibit, nor in the district court's opinion.

In sum, Teufel's claim of lien amount varied throughout this litigation, ranging from "$529,556.47 (plus interest) in its lien notice, $429,647.15 and $392,035.38 in its disclosure forms, $359,244.71 in its trial brief, and finally $406,199.07" in what ended up being marked as Trial Exhibit 9:056. In purporting to proffer evidence in support of its claim, Teufel identified the property it sought to foreclose on in different ways, first by description and then by alphabetized "parcels." The effect of the partial lien releases, if any, was not explained, and in many cases Teufel did not show that the work done was for an unreleased parcel. Based on the

confusing descriptions, conflicting testimony, and lack of evidence regarding the effect of the partial lien releases, the district court's calculation of Teufel's lien amount is affirmed based on the substantial evidence that Teufel did provide.

### D. The district court did not err in calculating interest.

Teufel argues on appeal that the district court incorrectly adopted Credit Suisse's interest calculation, which utilized a variable prime rate. The interest issue hinges on whether the Wells Fargo prime rate contemplated in the 2007 Agreement is variable or fixed. Section 6.4 of the 2007 Agreement provides:

> Payments due and unpaid under this Agreement shall bear interest from the date payment is due at a per annum rate equal to the prime rate published by Wells Fargo Bank in Boise, Idaho plus two percent (2%).

Teufel "identified the Wells Fargo Bank Prime Rate in effect on the date each of its unpaid invoices became due" and then added two percent, per the terms of the contract, to that fixed rate. Credit Suisse posits that the use of a fixed prime rate would be improper because the prime rate is, by its very nature, a variable rate that "changed regularly over the calculation period." The district court agreed with Credit Suisse in its Order Re: Attorney Fees.

The district court, "as an exercise of discretion," applied a variable prime rate in determining awards of prejudgment interest to Teufel and other lien claimants. The district court cited to www.fedprimerate.com in finding that a "prime rate, by its very nature, is a variable rate, and changes regularly over time." The district court further noted that applying a variable rate "more closely correlates to the actual loss sustained by the party who is owed money[,]" which in turn furthers the purpose of prejudgment interest awards: to compensate an injured party for the time value of money. *See Stueve v. N. Lights, Inc.*, 122 Idaho 720, 722–23, 838 P.2d 323, 325–26 (Ct. App. 1992). Ultimately, the district court awarded Teufel prejudgment interest at the variable rates put forth by Credit Suisse in an affidavit in support of its memorandum in opposition to Teufel's motion for prejudgment interest.

The district court did not err in its calculation of prejudgment interest. The language of Section 6.4 does not contemplate a fixed prime rate but, rather, a variable rate. The 2007 Agreement does not specify that the prime rate to be used is the one published on the date that payment becomes due; rather it states that "[p]ayments due . . . shall bear interest from the date payment is due at a per annum rate equal to the prime rate published by Wells Fargo Bank in

16

Boise, Idaho plus two percent (2%)." Had the parties intended to use the prime rate published on the date that payment became due, the 2007 Agreement could have easily reflected that intent by simply saying so. It did not. Indeed, the prime rate is, by its nature, a variable rate. This determination is consistent with existing precedent and, as the district court noted, fosters the underlying purpose of prejudgment interest awards. *See Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 883 n.10 (2011) ("Certainly, under a "variable-rate" plan the interest rate fluctuates according to an external variable easily discernable by the cardholder (like the Federal Prime rate . . . ."); *In re Yett*, 306 B.R. 287, 289 (B.A.P. 9th Cir. 2004) ("Both notes require interest at the same variable rate, initially 8.5%, calculated at the bank's 'prime rate' plus 1.5% per annum.").

Therefore, we affirm the district court's use of a variable rate and its calculation of interest made upon that rate.

**E.  The district court did not err in apportioning Teufel's costs and attorney fees.**

In its Order Re: Attorney Fees, the district court ultimately awarded Teufel attorney fees under Idaho Code § 45-513 in the amount of $162,775.20. Teufel initially sought an attorney fee award in the amount of $270,942.00, consisting of fees incurred with three separate law firms. The district court found that Teufel had only partially prevailed "because Teufel did not prevail on the most important issue: whether Teufel has priority over the bank." Because Teufel only partially prevailed, the district court reduced its requested fee award by 40%. The district court also awarded Teufel costs as a matter of right in the amount of $4,329.23, and discretionary costs in the amount of $4,865.56. In its analysis regarding discretionary costs, the district court disallowed Teufel's request for trial preparation supplies "because such costs appear to be ordinary and usual, not exceptional" and its request for legal research fees because those were included in the attorney fee award. The district court approved all other discretionary costs, and then reduced the award by 40%, just like it did the attorney fee award.

Teufel argues that the district court should have awarded it at least 75% of what it requested for attorney fees and costs. Its rationale is as follows: because Teufel initially sought $406,199.07 as its claim of lien award, but was eventually awarded $306,543.30, it recovered or "prevailed" on seventy-five percent of its claim. And, Teufel asserts, "the prevailing party should recover attorney fees and costs in the same percentage it is determined to be the prevailing party." Using that calculation, Teufel alleges that the district court should have awarded Teufel—at the least—attorney fees in the amount of $203,206.50 and discretionary costs in the

17

amount of $8,843.27. Credit Suisse admits that attorney fees are statutorily mandated in this instance, but argues that the district court acted well within the bounds of its discretion in finding that Teufel only partially prevailed, and in reducing Teufel's attorney fee requests and costs by 40%.

"In any civil action the court may award reasonable attorney fees . . . to the prevailing party . . . when provided for by any statute or contract." I.R.C.P. 54(e)(1). Idaho Code § 45-513 is such a statute. It provides:

> Any number of persons claiming liens against the same property may join in the same action, and when separate actions are commenced the court may consolidate them. The court shall also allow as part of the costs the moneys paid for filing and recording the claim, and reasonable attorney's fees.

I.C. § 45-513. This Court has explained that "[s]ince the costs of filing and recording, as well as the attorney fees, are incidental to the foreclosure of a lien pursuant to I.C. § 45–513, the award of attorney fees as part of the enforcement of the lien is a mandatory award." *Elec. Wholesale Supply Co., Inc. v. Nielson*, 136 Idaho 814, 823–24, 41 P.3d 242, 251–52 (2001).

Idaho Rule of Civil Procedure 54(d)(1)(B) is instructive when determining whether a party prevailed:

> (B) Prevailing Party. In determining which party to an action is a prevailing party and entitled to costs, the trial court shall in its sound discretion consider the final judgment or result of the action in relation to the relief sought by the respective parties. The trial court in its sound discretion may determine that a party to an action prevailed in part and did not prevail in part, and upon so finding may apportion the costs between and among the parties in a fair and equitable manner after considering all of the issues and claims involved in the action and the resultant judgment or judgments obtained.

I.R.C.P. 54(d)(1)(B). "The determination of prevailing party status is committed to the sound discretion of the district court and will not be disturbed absent an abuse of that discretion." *Jorgensen v. Coppedge*, 148 Idaho 536, 538, 224 P.3d 1125, 1127 (2010). Moreover, "the prevailing party question is examined and determined from an overall view, not a claim-by-claim analysis." *Eighteen Mile Ranch, LLC., v. Nord Excavating & Paving, Inc.,* 141 Idaho 716, 719, 117 P.3d 130, 133 (2005).

With regard to costs, Idaho Rule of Civil Procedure 54(d)(1)(D) allows a court to award discretionary costs. That rule provides:

> Additional items of cost not enumerated in, or in an amount in excess of that listed in subparagraph (C), may be allowed upon a showing that said costs were

18

necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party. The trial court, in ruling upon objections to such discretionary costs contained in the memorandum of costs, shall make express findings as to why such specific item of discretionary cost should or should not be allowed.

I.R.C.P. 54(d)(1)(D).

The district court did not abuse its discretion in reducing Teufel's attorney fee and discretionary cost requests by 40%. First, the district court repeatedly and explicitly recognized this issue as one within its discretion. Second, the district court acted within the boundaries of its discretion. Its analysis regarding whether Teufel had prevailed was consistent with the guidance provided in I.R.C.P. 54(d)(1)(B), and it made the determination "from an overall view" of the case, as opposed to utilizing a "claim-by-claim analysis." Third, the district court reached its decision by an exercise of reason. It made its decision after considering both parties' arguments, examining relevant law, and "review[ing] the detailed billing records."

## IV.
## CONCLUSION

We affirm the judgment of the district court in all respects. Costs on appeal to Credit Suisse.


Chief Justice BURDICK, and Justices EISMANN, W. JONES, and HORTON CONCUR.