# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48687

ROGER COOK and SHELLEY COOK, husband and wife,

    Plaintiffs-Appellants,

v.

JAY VAN ORDEN and SHELLI VAN ORDEN, husband and wife; DEXTER VAN ORDEN, an individual; LAVAR GROVER and JEANETTE GROVER, husband and wife;

    Defendants-Respondents,

and

MERRILL HANNY and BETHEA HANNY, husband and wife; DONALD G. ALLEN and KATHY ALLEN, husband and wife; BARRY COX and LINDA COX, husband and wife, and DOES I-V,

    Defendants.
_____

LAVAR GROVER and JEANETTE GROVER, husband and wife,

    Counterclaimants-Cross Claimants-
    Respondents,

v.

ROGER COOK and SHELLEY COOK, husband and wife,

    Counterdefendants-Appellants,

and

JAY VAN ORDEN and SHELLI VAN ORDEN, husband and wife; DEXTER VAN

Boise, January 2022 Term

Opinion filed:  March 24, 2022

Melanie Gagnepain, Clerk

ORDEN, an individual,                          )
                                               )
   Cross Defendants-Respondents,               )
                                               )
and                                            )
                                               )
MERRILL HANNY and BETHEA HANNY,                )
husband and wife; DONALD G. ALLEN and          )
KATHY ALLEN, husband and wife; BARRY           )
COX and LINDA COX, husband and wife,           )
                                               )
   Cross Defendants.                           )

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bingham County. Darren B. Simpson, District Judge.

The judgment of the district court is <u>reversed and remanded</u>.

Parsons Behle & Latimer, Idaho Falls for Appellants Roger and Shelley Cook. Jon Stenquist argued.

Cooper & Larsen, Pocatello, for Respondents Dexter C. Van Orden, Jay C. Van Orden and Shelli Van Orden. J.D. Oborn argued.

———————————————

MOELLER, Justice.

This appeal concerns whether a prescriptive easement exists on a road accessing property owned by Shelley and Roger Cook near the Bingham and Bonneville County line. The Cooks' property was originally owned by Shelley's grandfather, John Harker, and has stayed in the Harker family ever since. The Harker family (including the Cooks) claims to have used what the parties call "Tower Road" to access their property for as long as the family can remember. Tower Road connects the Cook Property to a county road and runs through property owned by Jay and Shelli Van Orden.

The Cooks filed suit against the Van Ordens claiming a prescriptive easement across the Van Ordens' property via Tower Road. The district court ruled in the Van Ordens' favor, holding that because the Cooks' longstanding use of the land was not adverse, it need not address the remaining elements of a prescriptive easement. The Cooks appeal to this Court, contending that

2

the district court erred in finding their family's use of Tower Road was with implied permission and in not addressing the remaining elements. For the following reasons, we reverse and remand.

## I. FACTS AND BACKGROUND

### A. The Lay of the Land

Shelley and Roger Cook (collectively, the "Cooks") sought to establish easement rights for ingress and egress to their property (the "Cook Property") across the land owned by Dexter Van Orden and Jay and Shelli Van Orden (the "Van Orden Property"), via Tower Road. Tower Road connects the Cook Property to a county road at 1129 South 10th East in Bonneville County. Tower Road also runs through the property of Merrill and Bethea Hanny, follows the border between the property of the Hannys and the property of Donald and Kathy Allen, runs through the Van Orden Property, and then passes through a corner of the property of Lavar and Jeanette Grover.[1] The Hannys, the Allens, the Coxes, the Van Ordens, and the Grovers are all owners of servient estates to the alleged easement over Tower Road. A side road, which cuts away to the east from Tower Road and then rejoins Tower Road north of the Grover property is referred to as the "Cut Out Road." *See* Figure 1, *infra*.

---

[1] Although not mentioned by the district court, the record shows after crossing through the Allens' property, Tower Road crosses into the property of Barry and Linda Cox for approximately two to three yards, which is presumably why the Coxes are named parties in this action.



**Figure 1. Map of Tower Road and Adjacent Properties**

## B. The Dominant Estate

In 1907, John Ray Harker ("John Harker Sr."), Shelley Cook's grandfather, homesteaded 160 acres in Bingham County. John Harker Sr.'s widow, Sarah M. Clark, was granted title to the Cook Property pursuant to the Homestead Act by U.S. President Warren G. Harding on June 23, 1922. John Harker Jr., Shelley Cook's father, dry-farmed the Cook Property until 1962. Over the years since, it has been conveyed to various family members before Shelley and Roger Cook obtained ownership in 2017. Shelley Cook was formerly Shelley Harker.

From 1962 until the late 1980s, John Harker Jr. leased the Cook Property to Allen Thompson, son of George Thompson. Allen Thompson and his son, Ted Thompson, dry-farmed

4

the Cook Property. In the late 1980s, the Cook Property was leased to the U.S. Government through the Conservation Reserve Program (the "CRP Program"). Ted Thompson put the Cook Property into the CRP Program, reseeded the property following CRP requirements, and continued to lease the Cook Property through 2018. The Cooks visited the Cook Property approximately 10 times per year when it was in the CRP Program to ensure it complied with the necessary requirements.

### C. The Servient Estate

In 1910, George Thompson purchased the land that is now the Van Orden Property, the Grover Property, and additional land south of the Cook Property. In 1968, George Thompson died. Gwen Thompson Wilts, one of George Thompson's daughters, inherited what is now the Van Orden Property. Another daughter, Afton Thompson Squires, inherited what is now the Grover property. She sold it to the Grovers in 1998. Gwen Thompson Wilts appointed her brother Allen Thompson, and later his son Ted Thompson, to act as agents for her property. Allen and Ted Thompson dry-farmed Wilts' property from early 1962 until 1993. In 1993, Ted Thompson placed Wilts' property into the CRP Program, where it remained until 2014. During this time, the Thompsons continued to manage the property on Wilts' behalf. In approximately 2015, the Longhursts purchased Wilts' property. In 2016 or 2017, the Van Ordens purchased the property from the Longhursts.

### D. Tower Road and the Van Orden Property

Tower Road takes its name from radio towers, which were built on land that was once part of the Van Orden Property. The district court made the following findings of fact regarding the use of Tower Road and the Van Orden Property.

From 1962 until the late 1980s, the Thompson family dry-farmed what is now the Cook Property, the Van Orden Property, and the Grover Property. In the spring they ran sheep over the three properties. The portions of those properties "that were not farmable were populated by wild sage brush [sic], quaking aspen, juniper trees, and rocks." Tower Road was the fastest and safest route from Ted Thompson's house to the three properties and the Thompsons' primary access to what is now the Cook Property. Ted Thompson removed the sagebrush from the flatter areas of what is now the Van Orden Property to dry-farm the land.

At least by the 1960s, a wire gate existed near the base of Tower Road (referred to as the "farmer's gate"). The farmer's gate was not locked and could be opened by anyone. From the 1960s until the late 1980s, John Harker Jr. and his family used the farmer's gate to enter Tower

5

Road. Ted Thompson and his son, Matthew, would occasionally stop strangers on what is now the Van Orden Property and either give them permission to use the property or turn them away. However, the Thompsons did not stop the Harkers because they believed the Harkers had a right to use Tower Road to access their property. "Shirley Thompson, who married Ted Thompson in 1972, knew the Harkers as 'good people' who were allowed to use Tower Road because they owned property in the area." When the Grovers used Tower Road, "it was by permission from the Thompson family." In the mid-1980s, Ted Thompson cut a shallow road, the Cut Out Road, and the Thompsons drove tractors, pickups, and horse trailers over the Cut Out Road.

Around the late 1980s, Ted Thompson erected a heavy metal gate at the base of Tower Road after the Bonneville Power Administration requested that he replace the farmer's gate with a sturdier gate to help keep out trespassers. The Bonneville Power Administration paid for the materials used to erect the gate. This new gate was locked, but the Thompsons gave gate keys to the Bonneville Power Administration, the radio tower owners, and the Harkers. Later, each put their own lock in a series of locks on the chain. If the Harkers forgot their key when using Tower Road, they would drive around the gate or access Tower Road via the Idaho Falls Country Club.

What is now the Cook Property was originally leased to the U.S. Government through the CRP program in the late 1980s, and the Thompsons continued to lease the property through 2018. During that time, the Cooks visited their property on average 10 times per year "to ensure it complied with the necessary requirements."

After the Longhursts purchased what is now the Van Orden Property in 2015, Roger Cook called Mr. Longhurst in the fall of 2016 to request a lock on the gate near the base of Tower Road to access the Cook Property. Longhurst was busy and could not discuss the matter. Months later, in the spring of 2017, Roger Cook reached out again, and Longhurst explained he had sold the property to the Van Ordens. The Cooks did not use Tower Road during the brief time the Longhursts owned the property.

At the time the Van Ordens purchased their property, it was only partially enclosed by a fence. The Van Ordens completely enclosed their property with a fence in the summer of 2017 and placed a new lock on the gate at the base of Tower Road. They also installed a gate at the border between the Van Orden property and the Grover property. The Van Ordens maintain they are willing to grant the Cooks permission to use Tower Road so long as the Cooks request permission

in advance. The Cooks, however, desire free access and assert they have acquired a prescriptive right to use Tower Road.

### E. Procedural History

On July 17, 2017, Helen Thompson, as trustee of the Harker Family Trust, filed a complaint against Jay and Shelli Van Orden (husband and wife) and Dexter Van Orden (Jay's son) to quiet title to Tower Road. Shelli, Jay, and Dexter Van Orden answered the complaint and counterclaimed seeking to quiet title to their own property. After Helen Thompson answered the counterclaim, Shelley and Roger Cook substituted in as the plaintiffs. While the record does not state why the Cooks substituted in, it is likely because the property was transferred to the Cooks from the Harker Family Trust in 2017.

The Cooks and the Van Ordens filed cross-motions for summary judgment. The district court denied both. Against the Van Ordens' objections, the district court permitted the Cooks to amend their complaint to clarify the description of the alleged easement. The Cooks were then granted leave to file the second amended complaint. The Cooks added additional servient estate owners—Donald and Kathy Allen, Barry and Linda Cox, Merrill and Bethea Hanny, and Lavar and Jeanette Grover—as defendants. The Grovers, Hannys, Allens, and Coxes did not contest the Cooks' claim for a prescriptive easement over their land. The Cooks also raised arguments for an implied easement by necessity, an implied easement by prior use, and public creation of an easement. These three claims were later dismissed when the district court granted the Van Ordens' motion to dismiss in part, leaving only the prescriptive easement claim.

On September 17, 2019, the district court granted the Cooks' motion for temporary access to use Tower Road during the pendency of this litigation. The parties stipulated to a judicial visit to the property which took place on October 11, 2019.

The parties tried their claims in a bench trial before the district court on October 6–8, 2020, and submitted their closing arguments on November 4, 2020. On January 12, 2021, the district court entered its Findings of Fact and Conclusions of Law. Both the current owners of the Cook Property (Shelley and Roger Cook) and two members of the Thompson family (Shirley Thompson and her son, Matthew Thompson) who previously took care of what is now the Van Orden Property on behalf of Wilts testified that the Harkers'/Cooks' use of Tower Road was not permissive. The district court concluded this testimony was credible. The district court also found that "the Thompsons did not stop the Harkers, because they believed the Harkers had a right to use the

7

Tower Road to access the Cook Property." However, the district court concluded that the Harkers'/Cooks' use was not adverse, and judgment was entered in favor of the Van Ordens on January 27, 2021. On March 9, 2021, the Cooks appealed to this Court.

## II.    STANDARD OF REVIEW

"Review of a trial court's conclusions following a bench trial is limited to ascertaining whether the evidence supports the findings of fact, and whether the findings of fact support the conclusion of law." *Borah v. McCandless*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009). "A district court's determination that a claimant has or has not established a private prescriptive easement involves entwined questions of law and fact." *Hughes v. Fisher*, 142 Idaho 474, 479, 129 P.3d 1223, 1228 (2006) (citing *Hodgins v. Sales*, 139 Idaho 225, 229, 76 P.3d 969, 973 (2003)). The Supreme Court "exercises free review over matters of law and is not 'bound by the legal conclusions of the trial court, but may draw its own conclusions from the facts presented.' " *Morgan v. New Sweden Irr. Dist.*, 160 Idaho 47, 51, 368 P.3d 990, 994 (2016) (citing *Credit Suisse AG v. Teufel Nursery, Inc.*, 156 Idaho 189, 194, 321 P.3d 739, 744 (2014)).

> On appeal, this Court will set aside findings of fact only if they are clearly erroneous. [*Hodgins*, 139 Idaho at 229, 76 P.3d at 973]; I.R.C.P. Rule 52(a). Thus, if a district court's findings of fact are supported by substantial and competent, though conflicting, evidence, this Court will not disturb those findings. [*Id.*] Also, this Court gives due regard to the district court's special opportunity to judge the credibility of the witnesses who personally appear before the court. *Id.* Consequently, we must determine whether the district court properly applied the legal requirements for an easement to the facts the district court found. *Marshall* [*v. Blair*], 130 Idaho [675,] [] 679–80, 946 P.2d [975,] [] 979–80 [(1997)] (prescriptive easement) . . .

*Hughes*, 142 Idaho at 479–80, 129 P.3d at 1228–29.

## III.    ANALYSIS

### A.  The district court erred in granting judgment to the Van Ordens without determining the relevant statutory period for determining adverse use.

Establishing an easement by prescription requires a party to "prove by clear and convincing evidence use of the subject property that is (1) open and notorious, (2) continuous and uninterrupted, (3) adverse and under a claim of right, (4) with the actual or imputed knowledge of the owner of the servient tenement, (5) for the statutory period . . ." *Id.* at 480, 129 P.3d at 1230.

The district court found that the Cooks' use of Tower Road was open and notorious, "continuous and uninterrupted from the early 1960s (if not before) until 2017," and with the actual or imputed knowledge of the Thompson family who was on the land on behalf of the owner of the

servient tenement. However, the district court also determined that the Cooks failed to show that their use of Tower Road was adverse. Since the district court found that adverse use had not been proven by clear and convincing evidence, the district court concluded the statutory period was irrelevant. The Cooks assert that the district court erred when it determined that their use was not adverse and, since it was adverse, the statutory period was relevant.

### 1. *The district court erred when it did not determine the relevant statutory period.*

To establish a prescriptive easement, a party must show that its use was open and notorious, continuous and uninterrupted, adverse, with the knowledge of the servient estate owner for the requisite statutory period. The statutory period was extended from 5 years to 20 years in 2006. *Capstar Radio Operating Co. v. Lawrence*, 153 Idaho 411, 425, 283 P.3d 728, 742, fn. 2 (2012); I.C. § 5-203. Importantly, however, "the twenty year time period does not apply to an easement by prescription acquired prior to the amendment." *Capstar Radio Operating Co.*, 153 Idaho at 425 n.2, 283 P.3d at 742, n. 2. To meet this period, "[a] claimant may rely on his own use, or he 'may rely on the adverse use by the claimant's predecessor for the prescriptive period, or the claimant may combine such predecessor's use with the claimant's own use to establish the requisite five continuous years of adverse use.' " *Beckstead v. Price*, 146 Idaho 57, 62, 190 P.3d 876, 881 (quoting *Hodgins v. Sales*, 139 Idaho at 225, 230, 76 P.3d 969, 974 (2003)). "Once a prescriptive easement has been established, 'discussion of permissive use afterwards is unnecessary.' " *Akers v. D.L. White Const., Inc.*, 142 Idaho 293, 303, 127 P.3d 196, 206 (2005) (quoting *Gibbens v. Weisshaupt*, 98 Idaho 633, 637, 570 P.2d 870, 874 (1977)). "When an easement of way by adverse use is thus created, it becomes fixed as an appurtenance to the real property which is subject to the prescriptive use and may be claimed by a successor in interest." *Wood v. Hoglund*, 131 Idaho 700, 703, 963 P.2d 383, 386 (1998).

The Cooks need not show that their use met the requirements of a prescriptive easement from 1908 to the present. If they claim the right was established prior to 2006, they only need to show their use met the requirements for a period of five years. Any evidence of permission after such period does not defeat their prescriptive easement claim. For instance, the district court found that in the late 1980s, Ted Thompson replaced the old farmer's gate with a sturdier gate, which was locked. The district court found that "the Thompsons gave keys to . . . the Harkers." The district court concluded that "the Thompsons' key and lock system on the heavy gate infers [sic] that the Thompsons permitted the Harkers/Cooks to use the Tower Road, whether expressly or

9

impliedly." Likewise, the district court also found that Roger Cook called Longhurst in 2014 "seeking permission to use the Tower Road." The district court found that "[t]he Cooks did not use the Tower Road during the one to two-year period the Longhursts owned the Van Orden Property." Any inference that permission was granted to use the road that may be drawn from the fact that the Harkers had a key to the Thompsons' gate or that Harker called to ask Longhurst for permission are irrelevant if such instances occurred after the relevant statutory period had been satisfied.

Thus, it is essential to know the period of time for which the district court based its conclusions. The record contains disputed evidence suggesting that there may have been periods when the use was adverse. Therefore, we hold that the district court erred when it declined to determine and assign a statutory period for its analysis.

### 2. Because the district court failed to make a finding regarding the statutory period, we cannot determine whether it erred when it determined the Cooks' use of Tower Road was not adverse.

As noted above, the district court did not identify the statutory period it considered because it determined doing so was irrelevant if the use was not adverse. However, a determination of relevance is not possible without first specifying what period the district court was looking at when it reached its conclusion that the use was permissive. The record suggests that there were potentially periods of adverse use that may have satisfied either the five-year or twenty-year period for establishing a prescriptive easement. In order to adequately review the district court's conclusions on appeal, we must know the time parameters it considered and then look to whether the use was adverse or permissive during those times.

To succeed on a prescriptive easement claim, a party must prove adverse use. "The nature of the use is adverse if it runs contrary to the servient owner's claims to the property." *Beckstead*, 146 Idaho at 62, 190 P.3d at 881 (quoting *Hodgins*, 139 Idaho at 231, 76 P.3d at 975). "Once the claimant presents proof of open, notorious, continuous, uninterrupted use of the claimed right for the prescriptive period, even without evidence of how the use began, he raises the presumption that the use was adverse and under a claim of right." *Id.* "Proof of all of these elements shifts the burden to the owner of the servient estate, who must demonstrate that the claimant's use was permissive." *Marshall v. Blair*, 130 Idaho 675, 680, 946 P.2d 975, 980 (1997).

The district court held that the Cooks' use of Tower Road was open and notorious, "continuous and uninterrupted from the early 1960s (if not before) until 2017," and with the actual

10

or imputed knowledge of the Thompsons. Ordinarily, this would allow the Cooks to utilize the presumption of adverse use. However, the district court determined that this presumption of adverse use was not applicable because it found that (1) the Harkers'/Cooks' use of Tower Road was in common with the Thompsons and (2) the Van Orden Property was unenclosed until the Van Ordens purchased the property and, therefore, the presumption of permissive use applied.

This Court has cautioned against becoming overly focused on discussions of shifting presumptions in prescriptive easement cases. *See Hughes*, 142 Idaho at 481, 129 P.3d at 1230. "To disentangle Idaho prescriptive easement law, we emphasize the need for courts to streamline their analysis by focusing simply on whether the five prescriptive easement elements have been satisfied based on the facts before them." *Id.* Knowing the relevant timeframe permits the court to focus only on the relevant facts.

Here, the district court determined that the presumption of adverse use did not apply because the Cooks' claims "center upon a roadway, used in common with the Thompson family." "In Idaho, the adverse use presumption has been rebutted by evidence of 'use of a driveway in common with the owner and the general public, in the absences of some decisive act on the user's part indicating a separate and exclusive use . . .' " *Beckstead*, 146 Idaho at 64, 190 P.3d at 883 (quoting *Marshall*, 130 Idaho at 680, 946 P.2d at 980). Thus, while use of a driveway in common with the servient estate owner, standing alone, does not necessarily establish permissive use, it has rebutted the presumption of adverse use.

The presumption of adverse use is inapplicable and rather permissive use is presumed "[i]f the servient estate is wild, unenclosed, or unimproved land." *H.F.L.P., LLC v. City of Twin Falls*, 157 Idaho 672, 681, 339 P.3d 557, 566 (2014). The district court applied the "wild, unenclosed, and unimproved" presumption of permissive use to the Cooks' claims. In *Cox v. Cox*, 84 Idaho 513, 522, 373 P.2d 929, 934 (1962), the Court held that the presumption of adverse use was only applicable to improved lands and "the lands cultivated and enclosed":

> The reason for the rule that a passageway over unenclosed and unimproved land is deemed to be permissive is sound and also easily understandable. . . . It assumes that the owner of such land in many instances will not be in position to readily detect or prevent others from crossing over his land, and, even if he did, he might not enter any objection because of a desire to accommodate others and because such usage resulted in no immediate damage to him. Also in such instances the landowner would probably have no reason to think the users of the passageway were to acquire any adverse rights. On the other hand there would be no reason or basis for such inference of permission on the part of the landowner if someone tore

> down his fence or destroyed his crops by reason of such usage. These acts alone would be calculated to put the landowner on notice that others were using his land adversely to his own interest and right of occupation.

*Id.* at 522, 373 P.2d at 934 (citing *Fullenwider v. Kitchens*, 266 S.W.2d 281, 283 (Ark. 1954)). "When a plaintiff claims a prescriptive easement over wild or unenclosed land, 'mere use of the way for the required time is not generally sufficient to give rise to a presumption that the use is adverse.' " *H.F.L.P., LLC*, 157 Idaho at 682, 339 P.3d at 567. "Moreover, if the presumption of permissiveness applied when the use began, the presumption continues until a hostile and adverse use is clearly manifested and 'brought home' to the servient property owner." *Id.*

The district court determined the presumption of permissive use set forth in *Cox* applied because "until the Van Ordens purchased the Van Orden Property it was never fully enclosed." The Cooks assert that the land must be wild, unenclosed, *and* unimproved. The Van Ordens attempt to clarify that the standard is "wild, unenclosed, *or* unimproved." While the Van Ordens are correct that the cases which employ this standard say "or," examination of those cases show that the standard is more correctly stated as "wild, unenclosed, *and* unimproved." *See Wood*, 131 Idaho at 704, 936 P.2d at 387. The Court in *Cox* explained, "This general rule fixing the presumption of adverse use is applicable to improved lands, *and* the lands cultivated *and* enclosed." *Cox*, 84 Idaho at 522, 373 P.2d at 934 (emphasis added). So, if the land is improved, enclosed, or not wild, the presumption of permissive use is inapplicable and the presumption of adverse use is not rebutted. Employing the district court's application of "or" would allow an improved but unenclosed property to utilize the presumption of permissive use. For example, an unenclosed property covered with buildings and pavement would be able to apply the same presumption as an unimproved parcel consisting of sagebrush and jackrabbits. This is clearly not the intent or purpose behind the presumption. Therefore, for a servient estate to utilize the presumption of permissive use, the land must be "wild, unenclosed, *and* unimproved." *Id*.

While there is no evidence that the Van Orden Property was fully enclosed before the Van Ordens purchased the property, Shelley Cook offered testimony that the land was improved:

> Q. And then you described the fields on either side of the road having been planted. How long had those fields been planted that you know of?
>
> A. For as -- I don't know how long they have been. You can tell from Google maps that they have been cut out into those sections where it has been --
>
> Q. Based on your personal memory, how long do you know those fields were there?
>
> A. Oh. Since the '60s.

12

Again, this highlights the importance of knowing the statutory period. Such evidence of improvement may vitiate the applicability of this presumption of permissive use.

Another problem with the district court's conclusion that the Cooks' use was not adverse is that it is contrary to the district court's own finding regarding the testimony of the dominant and servient estate owners. Both the current owners of the Cook Property, and two members of the Thompson family who previously took care of what is now the Van Orden Property on behalf of Wilts, testified that the Harkers'/Cooks' use of Tower Road was by right, rather than permissive. At trial, Shelley Cook, Roger Cook, Matthew Thompson, and Shirley Thompson offered uncontradicted testimony that the use was not permissive. The Van Orden's objected to Shelley Cook's testimony regarding her family's use of the property prior to her firsthand knowledge as hearsay. Shelley was born in 1956 and she established a foundation of knowledge regarding past use of Tower Road. The district court permitted Shelley to testify concerning her general historical knowledge of her family's use of Tower Road pursuant to Idaho Rule of Evidence 803(20). This hearsay exception allows a witness to testify concerning "[a] reputation in a community – arising before the controversy – concerning boundaries of land in the community or customs that affect the land, or concerning general historical events important to that community, state, or nation." I.R.E. 803(20). Shelley Cook testified that her family never asked for permission to use Tower Road:

> Q. Is there anything in your family history that would indicate that your family ever asked for permission to use Tower Road to access your property?
>
> A. No, there's not. . . .

She further testified that "[w]e were never told to get permission to go on the road."

Likewise, Roger Cook also testified the Harkers never received permission to use Tower Road:

> Q. And during the -- you know, the Harkers family [sic] use of the road and your use, do you ever recall asking for permission from anyone to use that road?
>
> A. Absolutely not.
>
> Q. And did you ever witness John Harker or did John Harker ever discuss with you asking for permission for the road?
>
> A. No.

Matthew Thompson, who worked with his father (Ted Thompson) on the servient estate for many years, testified that no one from the Harker family ever asked for permission to use Tower Road:

> Q. Are you aware of anyone in the Cook or Harker families ever asking you or your father for permission to use Tower Road?
>
> A. I don't. I don't know that they would have needed to. We had a good relationship with the Harker Family.

Shirley Thompson also testified that the Cooks never asked for permission to use Tower Road:

> Q. Did the Cooks, Roger and Shelley, ever seek permission from you or Ted to use Tower Road?
>
> A. No.

Importantly, Matthew and Shirley further testified that they believed the Harker family had a right to use Tower Road. Shirley testified:

> Q. In fact, if [the Harkers] didn't have a legal right to use it, you would give them permission to use it just because you're neighbors, correct?
> A. Well, some people we would do that. But they -- *they had a right to be there* because they owned the property. Other people that were on the road didn't own property up there.

(Emphasis added).

Matthew testified that while the Thompsons would stop other people from using Tower Road, they would not stop the Harkers/Cooks:

> Q. Okay. Did you ever see people up on Tower Road that didn't belong there?
>
> A. Oh, yeah. Several times -- or not several. Quite a few times.
>
> Q. And what would you and, maybe, if you know, your father do when you saw people up there who shouldn't be up -- who --
>
> A. Well, just kind of try to stop them and get an idea of what -- what they thought they were doing there.
>
> If I'd ever ran [sic] into somebody that had the last name Harker, there would have been no questions asked. *They had a right to be there*. But I turned some people around that didn't have any business being there a lot of times.
>
> Q. So is it fair to say that you guys regulated that road and watched it pretty close?
>
> A. Tried to.
>
> Q. So you're talking about these people who were going up there that you'd ask to leave.

14

Was John Harker and the Cook's [sic] use different for that roadway than other people you saw up there?

A. We didn't ever stop John Harker or anybody named Harker.

(Emphasis added).

Notably, the Grovers, neighbors to the Thompsons, asked for permission to use Tower Road. Frank Stanger, son-in-law of Jeanette Grover, testified:

Q. Okay. Regarding your access over those roads to the -- to the north of the property, from the country club or from the Taylor -- the cemetery area, are you aware that -- whether or not Lavar Grover ever asked anyone for permission to cross those road?

. . .

A. He just asked -- asked for permission and then made sure -- then made sure it was okay for his kids and grandkids to be on it too.

This testimony was not contradicted. Additionally, the district court made a finding consistent with this testimony:

Matthew Thompson, and his father before him, would stop strangers on the Van Orden Property and either give them permission to use the Van Orden Property or turn them away. The Thompsons did not stop the Harkers because they believed the Harkers *had a right to use* the Tower Road to access the Cook Property.

(Emphasis added). In a footnote attached to this finding of fact, the district court noted: "The credible testimonies of Shelley Cook, Roger Cook, Matthew Thompson, and Shirley Thompson supported this finding." However, despite this finding—and the finding that the Thompsons believed the Harkers had a right to use Tower Road—the district court concluded the Harkers'/Cooks' use was permissive, rather than based on a "right." In addition to relying on the presumptions mentioned, the district court also found the use was based on implied permission. The district court concluded:

the evidence suggests that the Harker/Cook families . . . used the Tower Road, and the connected Cut Out Road, by express or implied permission of the Thompsons. Given the longstanding friendship and business relations between the Thompson family and the Harker family, the Thompsons never denied the Harkers' or the Cooks' access to the Tower Road. Shirley Thompson understood that the Harker family could use the Tower Road because they were "good people" who owned property in the area.

The testimonies of the dominant and servient estate owners contradict the conclusion that the Harkers were allowed to use the property just because they were "good people."

It is not necessary to show a history of contentious or aggressive behavior to satisfy the "adverse use" element of a prescriptive easement—although, unfortunately, that is often the case. Adverse use may be established if the users can demonstrate that their use was not based on a grant of permission, but rather consisted of assertive conduct founded in common belief that they had a right to use the road without seeking permission. Here, Shelley Cook, Matthew Thompson, and Shirley Thompson all testified that the Harkers' and Cooks' adverse use of the road over the servient estate was predicated on the understanding that the Harkers had a right to use the road and did not need permission.

"A trier of fact may not arbitrarily disregard credible and unimpeached testimony of a witness . . . . [U]nless a witness's testimony is inherently improbable, or rendered so by facts and circumstances disclosed at trial, the trier of fact must accept as true the positive, uncontradicted testimony of a credible witness." *Wood*, 131 Idaho at 703, 963 P.2d at 386 (citations omitted). In *Wood*, the "record disclose[d] that the evidence from the Woods was not contradicted or disputed. Likewise, missing from the record is a finding by the district court that the Woods' testimony was not credible." *Id.* "It is in the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses. We will not substitute our view of the facts for the view of the district court." *Clayson v. Zebe*, 153 Idaho 228, 232, 280 P.3d 731, 735 (2012).

If the "credible" testimony of Shelley Cook, Roger Cook, Matthew Thompson, and Shirley Thompson referred to use of the road during a relevant statutory period of five or twenty years, that testimony could have established adverse use. However, since the district court did not identify the period its decision was based on, we cannot definitively state on review whether the district court erred in reaching its conclusion that the use was permissive. Therefore, we reverse and remand for the district court to determine the relevant period and evaluate the Harkers'/Cooks' use in light of that period.

## B. Attorney Fees on Appeal

The Van Ordens assert that they are entitled to attorney fees pursuant to Idaho Code section 12-121. "In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Inasmuch as the Van Ordens have not prevailed on appeal, they are not entitled to attorney fees.

## IV.    CONCLUSION

We reverse the decision of the district court and remand for a determination of the relevant statutory period for the claimed prescriptive easement and whether the evidence established adverse use during that time. The Van Ordens are not entitled to attorney fees on appeal. Costs are awarded to the Cooks as a matter of course pursuant to Idaho Appellate Rule 40(a).

Chief Justice BEVAN, Justices BRODY, STEGNER and ZAHN **CONCUR.**